Lorna Mae Christensen KOLAND, Plaintiff
and Appellant,

v.

Clayton JOHNSON, Defendant
and Respondent.

No. 8507.

Supreme Court of North Dakota.

Dec. 10, 1968.

Arnason & Pearson, Grand Forks, for appellant.

Pringle, Herigstad, Meschke, Loder, Mahoney & Purdy, Minot, for respondent.

ERICKSTAD, Judge.

Lorna Mae Christensen Koland commenced an action against Rodney G. McLachlan, Robert Webber, and Clayton Johnson by complaint dated July 27, 1966. The substance of her allegations follows:

At about 2:00 a.m. on July 28, 1962, she was a passenger seated in the right rear seat of an automobile owned by Robert Webber. The car was being driven by Rodney McLachlan with the permission and at the special instance of Robert Webber, although Mr. McLachlan was incapable of properly operating a motor vehicle because he was intoxicated and Mr. Webber knew this. Miss Christensen, as she was then, did not consent to Mr. McLachlan's operation of the car, but instead continuously protested to both the men about Mr. McLachlan's driving. At the time of the accident Mr. McLachlan was driving westward on a rural road between Newburg and Dunning in Bottineau County and was approximately 3 miles west of Newburg when he struck the rear of Clayton Johnson's automobile, which was parked on the south part of the roadway, headed west.

She alleged that the accident was a direct and proximate result of the intoxication and gross negligence of Rodney McLachlan, the gross negligence of Robert Webber, and the negligence of Clayton Johnson; and that as a direct and proximate result she was caused serious and permanent injury, pain and suffering, and medical and hospital expenses, for all of which she prayed judgment totalling in excess of $77,000.

As a result of a covenant not to sue and a stipulation of dismissal with prejudice entered into by Mrs. Koland and Mr. McLachlan and Mr. Webber, the case came on for jury trial in Bottineau on June 28, 1967, with Mr. Johnson the sole remaining defendant.

Mr. Johnson denied that he was negligent in the operation of his automobile and specifically denied that he had parked his automobile on the south side of the roadway. He further asserted that if Mrs. Koland had sustained any damages, they were caused or contributed to by her own negligence and that of other persons over whom he had no control.

Following the jury's dismissal of Mrs. Koland's complaint she made a motion for new trial. This motion was denied by order of the court dated December 14, 1967, and her appeal is from that order.

Mrs. Koland contends that the trial court erred in failing to grant her motion for new trial for the following reasons: (1) the verdict is contrary to the law and to the evidence; (2) the verdict is contrary to the weight of the evidence; (3) the evidence shows one of the contributing proximate causes of the plaintiff's injuries was the negligence of the defendant, Clayton Johnson; (4) there is no substantial evidence that the plaintiff was guilty of contributory negligence; (5) the court should have granted her motion for a directed verdict at the close of the defendant's case; and (6) the court erred in failing to give a certain requested instruction to the jury.

She asserts that there are two basic issues presented by this appeal: (1) whether the evidence shows that one of the proximate causes of her injuries was the defendant's negligence; and, correspondingly, whether the jury could find that she was contributorily negligent; and (2) whether the court erred in failing to give a certain requested instruction.

She concedes that one of the proximate causes was the negligence of Mr. McLachlan in driving the vehicle at an excessive speed in a cloud of dust while influenced by alcohol, but she insists that Mr. Johnson was negligent in stopping or suddenly reducing the speed of his vehicle on the roadway when he knew or should have known that a vision-obscuring cloud of dust existed to his rear.

She argues that if this court should find that Mr. Johnson's conduct constituted negligence (and that his negligence was a proximate cause of her injuries), the judgment based upon the jury's verdict must be reversed unless we should find that she was contributorily negligent.

As this court has said many times, there are certain fundamental rules which we apply in considering an appeal from an order denying a motion for new trial based upon the insufficiency of the evidence. We stated them in a recent case:

■ Questions of negligence, proximate cause, contributory negligence, and assumption of risk are ordinarily questions of fact for the jury; it is only when the evidence is such that reasonable men can draw but one conclusion therefrom that they become questions of law for the court. (citations omitted)

■ Whether a motorist is confronted with an emergency and, assuming that he was confronted with an emergency, whether he acted negligently, are also jury questions unless the evidence is such that reasonable men can draw but one conclusion therefrom. (citation omitted)

■ In determining the sufficiency of the evidence to sustain the verdict, the evidence must be viewed in the light most favorable to the verdict. (citation omitted)

■ The credibility of the witnesses and the weight to be given to their testimony are questions of fact for the jury to determine. (citation omitted)

Degenstein v. Ehrman, 145 N.W.2d 493, 503–504 (N.D.1966).

In the light of these rules, let us review the evidence, which is, for the most part, undisputed.

Lorna Christensen, then 18 years old, started the evening of July 27, 1962, by leaving Maxbass at about 6:30 with two friends, Carolyn Thompson and Sharon Webber, to attend a movie in Westhope. They rode in Sharon's father's car, with Sharon driving; returned to Maxbass about 9:30; and decided to go to a dance at Russell, abut 3 miles south of Newburg. They arrived at the dance pavilion about 10:30; bought tickets; and, because no one was in the pavilion, went out and sat in Sharon's car until about 11:00. They then saw Rodney McLachlan and Sharon's brother Robert and joined them in Robert's car for about half an hour. During this time both the men were drinking beer. The girls apparently then left the car to have supper, later returned to it for a short time, and thereafter Lorna spent the rest of the evening until about 1:45 a.m. dancing in the pavilion. Sharon Webber had wanted to leave early and had done so; and as Lorna had been invited by Robert to ride home with him, when the time came to leave, she left with Robert. He told her that Rodney McLachlan was going to drive and that she should sit with him in the back seat, which she did.

Lorna stated that she thought that she had perhaps seen Rodney drink a couple of cans of beer all the time they were together; and he conceded on cross-examination that he may have had nine beers and one vodka (apparently during the course of the evening and early morning). In any case, Lorna testified that she thought he did not act out of the ordinary or seem to be influenced by alcohol when she got into the car, but that afterward he drove very fast, 60 to 70 miles per hour on the very dusty gravel road—so fast, in fact, that they missed the curve and had to take the straight road near Newburg. She said she told him to slow down but he refused, and that he swore at her when she protested his driving. She said that as she did not know how to drive a car, she did not offer to take over the driving.

Robert had fallen asleep almost immediately on getting into the automobile. Lor-

na testified that she remembered having been told when she was a small child that "if you go to sleep you will get home faster," so after Rodney missed the curve, she thought perhaps if she went to sleep it would "all go fast," and thus she "sort of dozed off."

She apparently awoke in time to see the rear end of the Johnson car when it was only a "couple of car lengths" away. She said she didn't know what to do, but that she "hollered at Rodney to hit the brakes" and screamed. Before she screamed, Rodney's head was "slumped down" or "to the side" and when she screamed, he "just sort of jolted up." She said she thought the car ahead was toward the center of the road, and it seemed there was no place for them to go. When the Webber car hit the Johnson car, she was thrown from the back seat into the right front windshield, so that the windshield was broken. Her face was badly cut, and she received multiple fractures of her left arm.

The defendant, Clayton Johnson, had worked in his father's elevator at Maxbass until about 6:00 p.m. that day. He then had supper, and afterward he and his mother drove to Minot to visit his father, who was in the hospital there. They left Minot at about 10:30 or 11:00 o'clock, and when they returned to Maxbass he telephoned his fiancee, Carol Hunsker, who is now his wife, at about midnight and asked her if she wanted to go to the dance at Russell. They went to the dance and left there at about 2:00 a.m. He said that he drove his father's 1956 Cadillac, which was in good condition, with the taillights working, and, to the best of his knowledge, the brake lights working. He said he drove at a speed of 40 to 50 miles an hour. He testified that on leaving Russell he drove 3 miles north to Newburg, followed the curve around Newburg, and headed west. He said that as he approached the area where the accident occurred, he saw tracks or ruts in the road and a car parked on an approach which intersected the road from the south, and that he saw this car when

he was about 200 or 300 yards east of it. (This car was owned and was occupied at the time by Mark Helming.) He said he proceeded to stop because he wanted to see what was the matter, as it looked like an accident had happened. He said that he applied pressure to the brakes to slowly reduce his speed and that he looked to his rear to glance back at the parked car, and that it was then that headlights appeared out of the dust and there was a collision (the Webber car struck his car from behind). He said that after seeing the headlights he immediately turned his head forward, and in the meantime the collision occurred. He testified that he probably also pulled his car to the right at the time he was applying the brakes but conceded that it is possible he did not do so.

On cross-examination he conceded that he had given the following statement three days after the accident: "I thought this car had rolled over so I stopped to see if there was anything wrong. I put on the brakes and just made a natural stop. I thought we had come to a complete stop; however, my passenger Carol thought we were still moving a little." However, when questioned at the trial he maintained that he was positive he had not stopped his car at the time of the impact but instead was driving at a speed of about five miles an hour. He thought that he began to apply his brakes shortly after he passed the approach where the Helming car was parked.

He said that the only reason he could tell there were cars ahead of him was by the presence of dust on the road. In a deposition he had previously given, part of which was read during the trial, he stated that after leaving the dance he had seen nothing but darkness behind him until immediately before the Webber car struck his car.

Sheriff Lyle Lunde, who was a state highway patrolman at the time of the accident, testified that he reached the scene of the accident around 4:00 a.m. on July 28,

and that he then made certain measurements in his investigation of the accident. He testified that he saw marks in the gravel which commenced 6 feet from the north edge of the road and angled down into the north ditch, leading to the Johnson vehicle. It could be concluded from his other testimony and the drawings he made on an exhibit that there were also marks in the gravel extending from the point 6 feet from the north edge of the road where the other marks commenced to the point where the Webber car driven by McLachlan came to rest on the south side of the road. He further testified that there were brake marks extending east from the point where the marks in the gravel began 6 feet from the north edge of the road, the one to the north being 50 feet long and the one to the south being 42 feet long. The sheriff also verified the existence of the semicircular marks in the gravel near the approach. He said the surface of the road was 29 feet wide east of the accident and 28 feet wide west of the accident.

The sheriff testified that the taillights of the Johnson car were still burning when he investigated the accident; he did not mention whether the brake lights worked.

We think from the evidence set forth herein and other evidence submitted but not recited herein that the jury could reasonably have concluded that Mr. Johnson was confronted with an emergency, and that under the circumstances he exercised reasonable care; accordingly, we cannot say that reasonable men could have drawn only the opposite conclusions. We therefore find no abuse of the trial court's discretion in denying the motion for new trial based on the contention that the evidence sustains only the conclusion that Mr. Johnson was negligent and that his negligence was a proximate cause of Mrs. Koland's injuries.

We are also of the opinion from a review of the evidence that it is not such that reasonable men could have drawn but one conclusion as to the issue of contributory negligence. See Degenstein v. Ehrman, supra, 513.

This brings us to the concluding issue, which involves the alleged error on the part of the trial court to give a requested instruction. That instruction reads:

No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear. And he must first ascertain that such stop or decrease of speed can be made safely. The duty of a driver of a vehicle on making a sudden stop or decrease of speed will not be fully discharged by the mere operation of an automatic stop light on the back of his car, particularly in light of all the conditions of the road and the atmosphere at that time and place. Moreover it is necessary in order to comply with the statute that the signal given be appropriate in light of then existing conditions of the road and atmosphere.

The first part of the requested instruction is based on N.D.C.C. § 39–10–38(3), which reads:

39–10–38. Turning movements and required signals.—

*   *   *   *   *   *

3. No person shall stop or suddenly decrease the speed of a vehicle without first giving an appropriate signal in the manner provided herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal. North Dakota Century Code.

Mrs. Koland asserts that the testimony discloses no specific evidence that Mr. Johnson's brake light was operating. She states that Mr. Johnson merely testified that he thought his brake light was operating normally before the accident, and that Mr. McLachlan only saw red lights when he was 30 feet from Mr. Johnson's car and that these could have simply been the taillights rather than the brake lights. She

contends that in any event the jury was prevented from considering, not only these matters, but more importantly, the matter of whether the giving of a brake light signal was an "appropriate" signal under the atmospheric conditions existing at the time.

There seems to be general agreement about the atmospheric conditions at the time of the accident. Rodney McLachlan said: "[Q]uiet night—it was warm—road was awfully dusty—dry at that time—real dry—dust just seemed to hang in the air." Lorna Koland said: "It was real dusty—it was a beautiful night out—it was real dusty—real dry." Clayton Johnson said: "It was dusty because all of the cars that left the dance—northbound lane was dusty." He also answered, "Yes," when asked if he drove with the dust all the way from the dancehall to Newburg and if it was continuously dusty all the way to the west. Mark Helming said: "[I]t was real dusty * * *."

The trial court justified the refusal to give the requested instruction based upon § 39–10–38(3) on the ground that in the instant case there was no evidence that the brake lights of the lead vehicle, the Johnson car, did not flash or that they were defective, or that Mr. Johnson either suddenly stopped his automobile or suddenly decreased his speed simultaneously with the flash of the brake lights. It applied the rules that instructions are to be confined to the issues presented by the evidence and that the jury charge is to be considered as a whole, citing Bartholomay v. St. Thomas Lumber Co., 148 N.W.2d 278 (N.D.1966), and Teegarden v. Dahl, 138 N.W.2d 668 (N.D.1965). It is to be noted that the trial court did give an instruction on the general care the driver of a vehicle is required to exercise, based on the first paragraph of N.D.J.I. No. 201, and also an instruction on a motorist's duty to maintain a lookout.

We are, however, impressed with the argument made by Mrs. Koland in this case, that there was evidence of such a nature as to present a factual question as to whether the circumstances disclosed a stopping on a highway or a sudden decreasing of the speed of a vehicle on a highway when vehicles could be expected to be immediately to the rear.

From the sheriff's testimony and the measurements he took at the scene of the accident, the testimony of Mr. Helming, owner of the car parked on the approach, and the other evidence in this case, had this instruction been given to the jury, it might reasonably have concluded that Mr. Johnson brought his vehicle from a speed of 50 miles an hour at the approach to a speed of 5 miles an hour or less in 114 feet. According to the Uniform Table of Driver Stopping Distances, as contained in Am.Jur.2d Desk Book, Doc. No. 176, it takes a passenger vehicle traveling at 50 miles an hour 258 feet to stop. This is broken down into 55 feet perception distance, 55 feet reaction distance, and 148 feet stopping distance.

We are also impressed with Mrs. Koland's argument that if the defendant was unable to give an appropriate signal because of the conditions, he should not have stopped or suddenly decreased his speed but should have proceeded to an intersection or an approach or should have driven to the side of the roadway or even into the ditch if he could have done so with safety, providing no emergency prevented such action. Whether an emergency existed was a question of fact for the jury to determine when properly instructed.

Mrs. Koland relies for support of her position on a United States Circuit Court of Appeals decision construing our law. Although we are not bound by the decision, because we believe that the Circuit Court has given the proper construction to our law, we quote a part of that opinion:

In North Dakota the driver of a motor vehicle is under a statutory duty not to stop or suddenly decrease the speed of his vehicle "without first giving an *appropriate* signal in the manner provided

herein to the driver of any vehicle immediately to the rear when there is opportunity to give such signal." (Emphasis added [by the court in *Johnson*].) § 39–1038, N.D.R.C.1943, 1957 Supplement. Section 39–1039 of the North Dakota statute provides that a stop signal shall be given either by means of the hand and arm or by a signal lamp or lamps or mechanical signal device. In construing nearly identical statutes of Utah and Minnesota, under facts analogous to the instant situation, it was held that a jury question was presented as to whether the driver of the lead vehicle had warned the driver of the vehicle following closely behind, by appropriate signal, of his intention to stop or suddenly decrease his speed. See United States v. First Sec. Bank of Utah, 10 Cir., 208 F.2d 424, 429, 42 A.L.R.2d 951; Benson v. Hoenig, 228 Minn. 412, 37 N.W.2d 422, 425. Compare also Ryan v. Griffin, 241 Minn. 91, 62 N.W.2d 504, 507.

It is to be noted that giving a signal is not in itself sufficient statutory compliance. It must be an *appropriate* signal. * * * (emphasis added by the court in *Johnson*)

Johnson v. Hill, 274 F.2d 110, 114 (8th Cir. 1960).

In considering Johnson v. Hill, supra, and the cases on which it is based in light of Mrs. Koland's argument on the motion for new trial, the trial court discounted their pertinency by saying that those cases were all cases in which the brake light signal given was simultaneous with the stop or sudden decrease of speed when the lead driver knew or could have known of a following car. He was of the opinion that in the instant case there was no evidence that the Johnson vehicle either suddenly stopped or suddenly decreased its speed simultaneously with the flash of the brake light.

■ As we have intimated previously, however, we believe that such a determination was factual and that it should have been left to the jury to make. This view is supported by Blashfield:

§ 113.11 Duties—Leading Vehicle— Slowing or Stopping—Question of Law or Fact

Ordinarily the question whether the driver of a leading vehicle was negligent or contributorily negligent in the manner in which he stopped or slowed down on the highway is a question of fact for the jury. Likewise, *incidental questions pertinent to his negligence or exercise of care in stopping or slowing down, such as whether he was justified in stopping or slowing down, whether he made a sudden stop[,] whether he had a duty to give a warning of his intention to the driver of a following vehicle, and whether he gave a sufficient warning of his intention, are usually questions of fact for the jury.* (footnotes omitted; emphasis added.)

\* \* \* \* \* \*

2 Blashfield, Automobile Law and Practice (3d ed. 1965, Pocket Part 1968).

■ A case based on facts different from those in the instant case but such that they required the application of law pertinent to the instant case is a 1964 decision of the District Court of Appeals of the State of Florida, which stresses the point that the appropriateness of a signal is a question of fact for the jury to determine. In that case the court was construing two ordinances which were identical to Florida state statutes, almost identical to §§ 39–10–38(3) and 39–10–39(1) of our code. The court said:

No Florida decisions have been cited interpreting the ordinance or the statutes. However, it appears that in construing similar statutes or ordinances most courts in other states have adopted the view that the signal, whether given by hand or signal device, must be "appropriate," that the momentary flashing of a brake light given simultaneously with a sudden decrease in speed may be ineffec-

tive under certain circumstances and that, ordinarily, whether or not a signal was "appropriate" is a question of fact for the jury. (footnote omitted)

Haislet v. Crowley, 170 So.2d 88, 91 (Fla.Dist.Ct.App.1964).

In *Haislet*, the defendant, the plaintiff, and the driver of a third vehicle were proceeding, in that order, east on a four-lane highway on a clear, dry day. They were traveling at a speed of approximately 30 miles an hour in the south lane for eastbound traffic. As they approached a T-type intersection, traffic signs on the right advised motorists "Thru Traffic-Keep Right." Above the center of the intersection was a red-caution-green traffic light which controlled traffic in the north lane for eastbound vehicles. Traffic in the south lane for eastbound vehicles was controlled by a single green traffic light with an arrow permitting motorists in that lane to proceed eastward continuously. Traffic was heavy, but there were no cars immediately in front of the defendant.

The plaintiff in *Haislet* testified that as she approached the intersection she saw the defendant's brake lights come on, that she immediately slammed on her brakes and came to a squealing halt about one foot from the rear of the defendant's car, and that almost instantaneously she heard the squealing of brakes on the car to her rear and was hit by the third car, which drove her car into the defendant's car. The plaintiff estimated that the defendant was about 40 feet from the intersection when her brake lights came on, and that the defendant stopped at the edge of the intersection. The plaintiff further testified that before the stop at the intersection, the three vehicles had been traveling for approximately a mile at a speed of about 30 miles an hour, separated by a distance of about two or three car lengths.

The defendant testified that as she approached the intersection she did not see the through traffic signs on her right nor the continuous green traffic light over the lane in which she was traveling. She said that when she was about a block from the intersection she saw the traffic light in the center of the intersection turn red and that she began to slow, stopping at the intersection in a manner which she described as a slow stop, a normal stop.

The court answered the defendant's contention that she was free from negligence because her brake lights came on the moment she applied her brakes and this enabled the plaintiff to stop without striking the defendant, as follows:

We prefer and follow the rule that the fact that one or more following vehicles stopped or could have stopped without colliding with the vehicle ahead does not as a matter of law absolve the leading driver of negligence. We think the better rule * * * is that the appropriatness of a signal (used in the instant case in the sense of being adequate and sufficient in point of time) is ordinarily, and was here, a question of fact for the jury, to be resolved by consideration of all of the relevant facts and circumstances.

Haislet v. Crowley, supra, 91–92.

We conclude therefore that although the requested instruction may have been somewhat inarticulately drawn, the trial court was in error in refusing to give an instruction that expressed its substance, so that the jury could have considered whether under the circumstances of this case the defendant gave an appropriate signal, and so, in the event the jury had found that an appropriate signal was not given, it could have so considered that failure as evidence of negligence.

For the reasons stated, the order denying the motion for new trial is reversed, and the case is remanded to the trial court for a new trial.

TEIGEN, C. J., and PAULSON, STRUTZ and KNUDSON, JJ., concur.